IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

INTERNATIONAL UNION, UNITED
MINE WORKERS OF AMERICA, et al.,

                    Plaintiffs,

v.                                                            CIVIL ACTION NO.   5:16-cv-02030

MYSTIC, LLC, et al.,

                    Defendants.


**MEMORANDUM OPINION AND ORDER**


The Court has reviewed the *Defendants' Motion to Dismiss* (Document 5) , the *Defendants' Opening Memorandum of Law in Support of Their Motion to Dismiss* (Document 6), the *Defendants' Notice of Withdrawal of Their Motion to Dismiss with Respect to Personal Jurisdiction* (Document 11), the *Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint* (Document 14), the *Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss* (Document 21), the Plaintiffs' *Amended Complaint* (Amended Complaint, att'd as Ex. B to Def. Notice of Removal) (Document 1-5) and all attachments.   For the reasons stated herein, the Court finds that the Defendants' motion to dismiss should be denied.


**SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY**

The subject matter of this case is complex, and a concise summary of the allegations and the factual background underlying those allegations is helpful to the resolution of this motion. The Court will adopt the following facts as true for purpose of this motion.   The Plaintiffs are

retired coal miners represented by their union, the International Union, United Mine Workers of America (UMWA), and the Defendant, Mystic, LLC, is a former mine operator registered in Delaware, with a principal place of business in Beckley, West Virginia.   The Plaintiffs also named Timothy Elliott, the majority owner of Mystic, LLC, as a Defendant.

For more than sixty years, the coal industry has provided health care benefits to former coal miners and spouses, pursuant to multiemployer arrangements negotiated by the UMWA. Originally, these benefits were provided by a single plan, the UMWA Welfare and Retirement Fund of 1950.   Subsequent agreements between the UMWA and an association of mine operators, the Bituminous Coal Operators Association (BCOA), known as National Bituminous Coal Wage Agreements (NBCWA), preserved this structure.    After the enactment of the Employee Retirement and Income Security Act (ERISA), the single plan structure for benefits was replaced by two jointly administered benefit plans, colloquially known as the 1950 Benefit Plan and the 1974 Benefit Plan.   The 1974 Benefit Plan was modified by a new NBCWA in 1978, and primary responsibility for providing health benefits to retired miners and spouses was shifted from a collective structure to each individual mine operator.   Each operator was required to establish a separate plan for providing retirement health benefits.   However, the 1974 Benefit Plan was retained for one specific group: retired miners and their spouses whose final employer was "no longer in business."   (Pl. Amended Compl., at 11.)

Subsequent court decisions, handed down after the 1978 NBCWA, established that retirees were entitled to lifelong benefits, but that a particular operator's obligation was limited to the term of an NBCWA, and that the purpose of the 1974 Benefit Plan was to provide benefits for "orphan" miners, whose final employer was no longer a signatory.   *See District 29, UMWA v. Royal Coal*

2

*Company* ("Royal 1"), 768 F.2d 588 (4th Cir. 1985); *District 29, UMWA v. UMWA 1974 Benefit*

*Plan* ("Royal II"), 826 F.2d 280 (4th Cir. 1987); *United Mine Workers of America v. Nobel*, 720

F. Supp. 1169 (W.D.Pa.1989), *aff'd*, 902 F.2d 1558 (3rd Cir. 1990).   In the aftermath of these

decisions, many operators ceased operations, and their obligation to provide health benefits to

retirees and spouses shifted to the 1974 Benefit Plan.

   In 1992, Congress passed the Coal Industry Retiree Health Benefit Act, 26 U.S.C. §9701-

9722 (2006).   This statute merged the 1950 Benefit Plan and the 1974 Benefit Plan, and closed

these plans to future retirees.   As a result, the 1993 NBCWA created a new multiemployer plan

for orphaned retirees (the "1993 Plan").   The terms of the 1993 Plan stipulated that each operator

was responsible for the benefits of retired miners and spouses, and that the plan would only provide

benefits if the miner's last employer was both (1) no longer in business, and (2) no longer

financially capable of providing benefits.   An operator was "no longer in business" under the 1993

Plan if the following circumstances were present:

> (I) The Employer has ceased all mining operations and has ceased employing persons under [the 1993 Plan], with no reasonable expectation that such operations will start up again; and (II) The Employer is financially unable (through either the business entity that has ceased operations … including any of such company's successors and assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses ….

(1993 NBCWA, at 148, att'd to as Ex. 1 to Pl. Amended Compl., at ¶19, att'd as Ex. 4 to Def.

Not. of Removal).   The Plan explicitly stated that: "…language references to "for life" and "until

death" … are intended to mean that each employer will provide, for life, only the benefits of its

own eligible retirees who retired between February 1, 1993 and the Effective Date, or who retire

during the term of this agreement."[1] (1993 NBCWA, at 163, att'd as Ex. 1 to Pl. Amended Compl., at ¶44, att'd as Ex. C to Def. Not. of Removal.)  The 1993 Plan, in effect, created a lifetime obligation for a miner's last signatory employer to provide retirement health insurance coverage.  *See District 17, UMWA v. Brunty Trucking Co.*, 269 F.Supp. 2d 702, 708-09 (S.D.W.Va. 2003).  Every subsequent NBCWA, including the 1998, 2002, 2007, and 2011 agreements, have continued this permanent obligation.

The corporate Defendant in this case, Mystic, LLC is the successor-in-interest to Mystic Energy, Inc., a West Virginia corporation incorporated on November 26, 1985.  Mystic Energy, Inc., was a signatory to the 1993, 1998, and 2002 NBCWA.  Mystic, LLC was organized as a limited liability company in the state of West Virginia on June 12, 2003.  Mystic, LLC and Mystic Energy, Inc., merged on July 2, 2003, and Mystic, LLC was the surviving entity.  Mystic, LLC was a signatory to the 2002 NBCWA, which became effective on January 1, 2003.  The Defendant, Timothy Elliot (Elliott), was the majority owner of Mystic, LLC.

On July 2, 2003, Rainbow Trout Coal, LLC (Rainbow Trout), acquired Mystic, LLC. Rainbow Trout was organized in West Virginia on July 1, 2003, and was owned by Trout Coal Holdings II, LLC.  Rainbow Trout was managed by Defendant Elliott, who was also a minority owner of Trout Coal Holdings II (TCHII).  In March of 2005, Rainbow Trout transferred Mystic, LLC to Trout Coal Holdings III (TCHIII).  Defendant Elliott was also a minority owner of TCHIII.

---

[1]  The Plaintiffs, in their *Amended Complaint*, indicate that they attached the 2002 NBCWA as Exhibit 1.  However, Exhibit 1 is the 1993 NBCWA.  The Court is required on a motion to dismiss to view all facts alleged by the Plaintiff as true, and the Plaintiffs have indicated, in the *Amended Complaint*, that the retirement health care obligations contained in the 2002 NBCWA is identical to or substantially similar to those of the 1993 NBCWA, (See Amended Complaint, at ¶21, att'd as Ex. B to Def.'s Not. of Removal).  Thus, the Court will accept for purposes of this motion that the language of the 2002 NBCWA retirement health care obligation is identical or substantially similar to that of the 1993 NBCWA.

Mystic, LLC ceased operations in 2006.   At the time, Mystic, LLC and TCHIII held over $12 million in cash assets.   Mystic's liabilities at the time it ceased operations were limited to withdrawal liability from the UMWA 1974 Pension Plan, and Mystic, LLC's contractual obligation to provide retirement health care benefits to retired miners under the 2002 NBCWA. Before ceasing operations, Mystic, LLC sold a significant amount of mining equipment.   The proceeds from this sale were purportedly distributed to Defendant Elliot, among others.   Mystic, LLC also allegedly paid a substantial sum for a "property option" in 2005, and subsequently omitted the transaction from its books.   (Pl. Amended Compl., at ¶31.)   TCHIII also purportedly distributed "millions of dollars" to its owners, including Defendant Elliott, between 2005 and 2007.   (*Id*. at ¶32.)

After ceasing operation, Mystic, LLC continued to provide retirement benefits to its own retirees, in compliance with its obligations under the 2002 NBCWA.   On July 3, 2012, however, Mystic, LLC sent retirees, including the Plaintiffs named in this case, a letter stating that it no longer had sufficient resources to provide health care benefits.   (*See* July 3, 2012 letter, att'd as Ex. 8 to Pl. Amended Compl., att'd as Ex. B to Def. Not. of Removal.)   Mystic, LLC terminated retiree health care benefits on July 31, 2012.   Subsequently, the United Mine Workers Association Selective Strike Fund provided limited health care coverage to Mystic, LLC retirees.

On July 31, 2012, a significant number of Mystic, LLC retirees filed applications for orphan health care benefits from the 1993 Plan.   Determination of their eligibility was submitted to the Trustees of the 1993 Plan, in compliance with the governing documents.   On April 24, 2013, the Trustees indicated that they were unable to reach agreement on whether the retirees were eligible for orphan benefits.   Under the terms of the 1993 Plan, a deadlocked vote of the

Trustees requires submission of the issue to binding arbitration. During the pendency of the arbitration, the Selective Strike Fund continued to provide limited health care benefits to Mystic, LLC retirees.

On March 26, 2013, the Trustees of the United Mine Workers Health and Retirement Funds (Trustees), acting on behalf of the 1993 Plan, entered into a settlement agreement (the "Settlement Agreement") with Mystic, LLC and TCHIII.[2] (*See* Settlement Agreement, attached as Ex. B to Def. Mot. to Dismiss.) The settlement addressed litigation brought in 2011 by the 1993 Plan against Mystic, LLC in the Southern District of West Virginia. The terms of the settlement provided that Mystic, LLC and TCHIII would make an initial payment of $1,060,000 to the UMWA 1974 Pension Trust within thirty days of the execution of the settlement. Mystic, LLC and TCHIII would then make a second payment within six months of the execution of the settlement, consisting of the balance of the liquid assets of each entity, less "reasonable expenses" necessary to wind up Mystic, LLC's legal existence. (*See Id*., at ¶1.) In consideration for these payments, the Trustees and the various funds involved in the litigation agreed to release Mystic, LLC and TCHIII from "any and all claims … which each party [has] or could have asserted as of the date" of the settlement. (*Id*. at ¶2.) The release was limited to "Mystic, LLC and TCHIII alone," and did not extend to "officers, directors, employees, agents, affiliates, owners, former owners, controlled group members, and current or former related entities" of the companies. (*Id*.) The release also covered the Trustees, their respective funds, and "any of Funds' past,

---

2  As explained below, the Plaintiffs did not reference or attach the Settlement Agreement to their *Complaint* or their *Amended Complain*t.  Rather, the Settlement Agreement was first raised by the Defendants in their motion to dismiss, and the Court must determine whether it may consider the Settlement Agreement for purposes of this motion.  The Court has included the Settlement Agreement in this factual summary as a matter of convenience, and the references to the Settlement Agreement should not be considered as a finding on whether the Settlement Agreement may be properly considered, or as a decision by the Court to take judicial notice of the Settlement Agreement.

present, and future Trustees, administrators, employees, agents, representatives, counsel, officers, directors, affiliates, predecessors, and successors and assigns…" (*Id*.)   The settlement agreement is also limited "to matters resolved herein and does not address any other matter such as eligibility for health benefits from the 1993 Plan."   (*Id*. at ¶7.)

On July 25, 2014, Arbitrator Elliott Shaller found that Mystic, LLC's retirees were ineligible for orphan benefits under the 1993 Plan, because Mystic, LLC was still operating at the time the 2002 NBCWA expired.   (*See* Arbitration Decision, at 28, attached as Ex. 7 to Pl. Amended Complaint, Att'd as Ex. D to Def. Notice of Removal.)   Since that date, the Selective Strike Fund has continued to provide Mystic, LLC retirees with benefits.

The Plaintiffs then initiated this case with the filing of a *Complaint* (Document 1-3) in the Circuit Court of Wyoming County, West Virginia, on November 20, 2015.   On December 14, 2015, the Plaintiffs filed an *Amended Complaint* (Document 1-4) in the same jurisdiction.   In their *Amended Complaint*, the Plaintiffs brought three claims, each arising under West Virginia law. Count I asserts claims for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing.   The Plaintiffs first contend that because Mystic, LLC was a signatory to the 1993, 1998, and 2002 NBCWA, the company was obligated under the contractual language of those agreements to provide lifetime healthcare to retirees and eligible dependents.   By discontinuing benefits on July 31, 2012, the Plaintiffs assert that Mystic, LLC breached the terms of the NBCWA, giving rise to a claim for breach of contract.   The Plaintiffs further contend that Mystic, LLC acted in bad faith, by "siphoning off millions" in "an effort to rid its self[sic] of its obligation to provide lifetime healthcare to its retirees…"   (Pl. Amended Compl., at ¶46, att'd as Ex. C. to Def. Not. of Removal.)   To establish damages, the Plaintiffs assert that they have suffered "significant costs

and expenses in procuring healthcare benefits and coverage," and that because some of these costs have been covered by the Selective Strike Fund, the United Mine Workers Association will have fewer resources to assist other members in the future.

Count II asserts individual liability for breach of contract against Defendant Elliott.   The Plaintiffs contend that Elliott improperly distributed the assets of Mystic, LLC to himself, and to companies in which he held a direct interest, between 2005 and 2010.   The Plaintiffs further assert that Elliott failed to properly document these purportedly improper transactions.   Thus, the Plaintiffs contend that Elliott is personally liable for Mystic's breach of the NBCWA.   Count III is a claim for unlawful distribution against Defendant Elliott.   The Plaintiffs allege that Elliott, as majority owner of Mystic, LLC improperly distributed assets as part of a scheme to avoid providing lifetime retirement benefits to Mystic, LLC retirees.   The Plaintiffs allege that Elliott's conduct violated W.Va. Code §31D-6-640 (2013), which bars distributions by a corporation that would render the corporation insolvent, or unable to pay debts incurred in the ordinary course of business.

The Defendant removed the case to this Court on March 2, 2016.   The Defendant moved to dismiss the *Amended Complaint* on March 9, 2016, on three grounds: (1) that the UMWA had previously released the Defendant from all claims raised in the Amended Complaint; (2) that this Court lacked personal jurisdiction over Defendant Elliot; and (3) that the Plaintiffs' state law claims were preempted by ERISA, and must be dismissed under the ERISA statute of limitations. On March 28, 2016, the Defendant withdrew all arguments relevant to personal jurisdiction.   The Plaintiffs responded to the motion to dismiss on April 8, 2016, and the Defendant filed a reply on April 26, 2016.   The motion to dismiss is now ripe for review.

8

## STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).   "[T]he legal sufficiency of a complaint is measured by whether it meets the standard stated in Rule 8 [of the Federal Rules of Civil Procedure] (providing general rules of pleading) . . . and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.)"   *Id.*   Federal Rule of Civil Procedure 8(a)(2) requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).

In reviewing a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the Court must "accept as true all of the factual allegations contained in the complaint."   *Erikson v. Pardus*, 551 U.S. 89, 93 (2007).   The Court must also "draw[] all reasonable factual inferences from those facts in the plaintiff's favor."   *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). However, statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim.   *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).   Furthermore, the Court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments."   *E. Shore Mkts., v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice… [because courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"   *Iqbal,* 556 U.S. at 678 (quoting *Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570.)   In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly,* 550 U.S. at 570.)   In the complaint, a plaintiff must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief."  *Francis,* 588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 557.)   "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal,* 556 U.S. at 679.

## DISCUSSION

In moving to dismiss this action, the Defendants make two arguments.[3]  The Defendants first contend that each of the Plaintiff's claims against Mystic, LLC are subject to the release provisions of the Settlement Agreement.   (Def. Mem. in Supp. of Mot. to Dismiss, at 1.)   If the Settlement Agreement does not bar the Plaintiff's claims, the Defendants argue that the claims are properly classified as claims for benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act (ERIRA), 29 U.S.C. §1132(a)(1)(B), or claims for a breach of an ERISA fiduciary duty under Section 502(a)(3)(B), 29 U.S.C. §1132(a)(3)(B).[4]  The Defendants then assert

---

[3]  The Defendants initially moved to dismiss all claims against Defendant Elliott on personal jurisdiction grounds, but subsequently withdrew that position.

[4]  In an unusual briefing strategy, the Defendants assert the ERISA statute of limitations as an affirmative defense, without first presenting a legal argument as to why the Plaintiffs' state law claims are preempted by ERISA.

that the claims against them are time-barred under the statute of limitations for these ERISA rights of action, 29 U.S.C. §1113.   The Court will address each argument below.

### A.   The Settlement Agreement

Before assessing the validity of the Defendants' argument, the Court must address the threshold question of whether the Settlement Agreement can be considered at this stage of the litigation.   It is well established that where a Plaintiff attaches a document to a complaint, the Court may consider that document in determining a motion to dismiss.   *Belmora LLC v. Bayer Consumer Care, AG*, 819 F.3d 697, 705 (4th Cir. 2016), citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).   However, Courts may not consider extrinsic documents submitted by a defendant on a motion to dismiss, without first converting the motion to a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.   *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015), citing *E.I. Du Pont de Nemours & Co.*, 637 F.3d at 448.   Such a conversion is inappropriate where the parties have had insufficient opportunity to conduct discovery.   *E.I. Du Pont de Nemours & Co.*, 637 F.3d at 448.   Thus, under most circumstances, the Court may only consider a document attached to a motion to dismiss when the document is either "integral to and explicitly relied upon in the complaint," and when the "plaintiffs do not challenge [the document's] authenticity."   *Zak*, 780 F.3d at 607, citing *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (citations omitted).   To be "integral," a document must be one that "by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'"   *Howes v. Wells Fargo Bank, N.A.*, 2015 WL 5836924, at *21 (D. Md. Sept. 30, 2015) (Hollander, J.),

quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp. 2d 602, 611
(D. Md. 2011).

The Northern District of West Virginia's recent decision in *Elliott v. AAA Insurance,* 2016
WL 276651 (N.D.W.Va. May 12, 2016) (slip. op.) (Stamp, J.) provides a compelling example of
an "integral" document, and a pertinent contrast to the facts here.   In *AAA Insurance*, the
Defendant attached a settlement agreement to a motion to dismiss, brought under Rule 12(b)(6).
*AAA Insurance*, 2016 WL 276651, at *4.   The plaintiff requested that the district court convert
the 12(b)(6) motion to a motion for summary judgment, based on the presentation of extrinsic
evidence.   *Id*.   The Court declined, finding that the plaintiffs had referred to the settlement
agreement repeatedly in their complaint, and that the settlement was "central" to their claims.   *Id*.
at *5.   Thus, the Court found that it was empowered to consider the document in reviewing the
defendant's motion to dismiss, without converting the motion to a motion for summary judgment.
*Id*.

Here, the Plaintiffs do not refer to the Settlement Agreement in either their *Complaint* or
their *Amended Complaint*.   Further, the parties have yet to have the opportunity to conduct
discovery.   Thus, the Court would ordinarily be barred from consideration of the Settlement
Agreement in reviewing this motion.   However, the Fourth Circuit has carved out a narrow
exception to the general rule on documents attached to a motion to dismiss, based on the judicial
notice provisions of Federal Rule of Evidence 201.   Under this exception, the Court may take
judicial notice of extrinsic facts, including facts introduced by a Defendant on a motion to dismiss,
where the "fact which is not subject to reasonable dispute," because it is "generally known within
the court's territorial jurisdiction," or "can be accurately and readily determined from sources

12

whose accuracy cannot reasonably be questioned." *Zak*, 780 F.3d at 607, quoting Fed. R. Evid. 201. If the Court takes judicial notice of such facts, the Court must review them in the light most favorable to the Plaintiff. *Zak*, 780 F.3d at 607.

In applying this exception, courts in the Fourth Circuit have generally only taken judicial notice of documents which were generally available to the public. *See, e.g., Clatterbrook v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013) (district court was entitled to consider public recordings of legislative proceedings, but failed to view facts in light most favorable to the Plaintiff); *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995), judgment vacated on other grounds, 517 U.S. 1206 (1996), readopted, 101 F.3d 325 (4th Cir. 1996), cert. denied, 520 U.S. 1204 (1997) (finding district court's consideration of legislative history of ordinance, including city council transcripts, appropriate); *Simpson v. City of Charleston*, 2013 WL 6524633, at *4 (S.D.W.Va. Dec. 12, 2013) (Goodwin, J.) (unverified police report attached to Defendants' Rule 12(b)(6) motion was insufficient to resolve issues of fact, and required further discovery before consideration by Court).

The Court declines the opportunity to take judicial notice of the Settlement Agreement. As a preliminary matter, a review of the docket from the litigation giving rise to the Settlement Agreement (*Holland, et al. v. Mystic, LLC*, No. 5:11-cv-00646) indicates that while the parties reached a settlement agreement, resulting in dismissal of the case on May 6, 2013, the Settlement Agreement, itself, is not a part of the public record. Thus, this case is in direct contrast to *Clatterbrook*, *Anheusier-Busch, Inc.*, and *Simpson*, as the document's authenticity cannot be confirmed independently by the Court. This alone, however, does not preclude the Court from taking judicial notice of the Settlement Agreement, because the Plaintiffs do not question its

authenticity.   Instead, the Plaintiffs point out the difficulties with the Court's consideration of the Settlement Agreement.   The Plaintiffs convincingly assert that neither the UMWA nor the individual Plaintiffs in this action were parties to the Settlement Agreement, that the Settlement Agreement does not address the claims by any of the Plaintiffs in this case, and that the Trustees to the Funds that entered into the Settlement Agreement had no power to bind the UMWA.   (Pl. Opposition, at 10-13.)   Thus, while the authenticity of the Settlement Agreement itself may be undisputed, there are significant issues of fact as to whether the Settlement Agreement would bind the Plaintiffs.   The Plaintiffs, therefore, argue that judicial notice of the Settlement Agreement is inappropriate.   *Id*. at 19.

Given these issues, the Court would be ill-equipped at this juncture to determine if the Settlement Agreement barred all claims by the Plaintiffs.   The Court has insufficient information to properly define the relationship between the UMWA, the individual Plaintiffs, and the Trustees who negotiated the Settlement Agreement.   The Court also has insufficient information to determine whether there is any overlap between the scope of the Settlement Agreement, which addressed claims for pension withdrawal liability and claims under the 1993 Plan, and the claims asserted by the Plaintiffs in this action.   Further discovery is required to resolve these questions. Taking judicial notice of the Settlement Agreement in this case would therefore go beyond Fourth Circuit precedent, and also stretch the limits of Fed. R. of Evid. 201.   Thus, the Defendants' arguments regarding the Settlement Agreement should not be considered for purposes of this motion.

B.    *ERISA Preemption*

The Defendants' second argument, which invokes the ERISA statute of limitations, requires the Court to address the threshold issue of whether the Plaintiff's claims are preempted by ERISA.   There are two species of preemption in federal court: ordinary preemption, also known as "conflict preemption," and the jurisdictional doctrine of field preemption, also known as "complete preemption."   *Sonoco Products Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003).   Conflict preemption arises where the application of state law conflicts with a federal statute, federal constitutional provision, or rule of the United States Supreme Court.   *Id*., citing *Darcangelo v. Verizon Communications*, 292 F.3d 181, 186 (4th Cir. 2002).   By contrast, complete preemption applies where "Congress 'so completely preempt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character," and all claims in the complaint must be brought under federal law.   *Darcangelo*, 292 F.3d at 186-87, quoting *Metropolitan Life Ins. v. Taylor*, 481 U.S. 58, 63 (1987).

ERISA is among a rare breed of federal statutes that implicate both preemption doctrines. The Court will first discuss complete preemption.   ERISA creates a comprehensive federal regulatory regime for the provision of benefits by employers to employees.   *Retail Ind. Leaders Ass' v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007), citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).   The primary objective of ERISA was to "provide a uniform regulatory regime over employee benefit plans."   *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). ERISA's preemptive scope is set forth by Section 514(a), which preempts all state laws that "relate to" any "employee benefit plan" governed by ERISA.   29 U.S.C. §1144(a).   ERISA, therefore, "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee

15

benefit plan." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 377 (4th Cir. 2001), quoting 29 U.S.C. §1144(a).

A state law "relates" to an employee benefit plan if it has a connection or reference to such a plan. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). ERISA's preemptive effect extends to any state law which "refers to or has a connection with covered benefit plans," even if the law was not designed to affect such plans. *Griggs*, 237 F.3d at 377-78, quoting *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129-30, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (citations omitted). "The phrase 'relates to' is given its common sense meaning as having '[1] connection with or [2] reference to such a plan.'" *Am. Med. Security, Inc. v. Bartlett*, 111 F.3d 358, 361 (4th Cir. 1997), quoting *Shaw*, 463 U.S. at 96-97. "As long as the nexus between state law and the employee benefit plan is not too tangential, 'a state law of general application, with only an indirect effect on a [benefit plan], may nevertheless be considered to 'relate to' that plan for preemption purposes.'" *Griggs*, 237 F.3d at 378, quoting *Smith v. Durham-Bush, Inc.*, 959 F.2d 6, 9 (2nd Cir. 1992). To determine if a particular state law is preempted by ERISA, Courts must look first to the preemptive scope of the statute. *Metropolitan Life Ins. V. Taylor*, 481 U.S. 58, 62-63 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).

For purposes of ERISA preemption, a "state law" includes all decisions rendered by the courts of a state. 29 U.S.C. §1144(c)(1). Thus, in certain circumstances, state common law claims, including claims for breach of contract and breach of the duty of good faith and fair dealing, fall within ERISA's preemptive scope. *Griggs*, 237 F.3d at 378, citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990). However, ERISA's preemptive effect is not unlimited. "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a

manner to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n.21.   In accordance with this principle, the Fourth Circuit has found that a legal malpractice action against an attorney representing an ERISA plan is not preempted by ERISA.   *See Custer v. Sweeney*, 89 F.3d 1156, 1157 (4th Cir. 1996).   Similarly, the Ninth Circuit has found that an employer's malpractice claims against an accountant retained to set up an ERISA plan were not preempted by ERISA.   *See Toumajian v. Frailey*, 135 F.3d 648, 656 (9th Cir. 1996).

ERISA also implicates conflict preemption.   Specifically, ERISA will preempt any state law claims which conflict with the civil enforcement provisions found in Section 502, 29 U.S.C. 1132.   The Supreme Court has held that the six enforcement provisions contained in Section 502 constitute a "comprehensive civil enforcement scheme" that represents a "careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 487 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.E.2d. 39 (1987).   The Supreme Court has further held that "[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA participants were free to obtain other remedies under federal law that Congress rejected in ERISA." *Id.*

Two provisions of Section 502 are applicable to this case.   Section 502(a)(1)(B) empowers "a participant or beneficiary" of an ERISA plan to bring a cause of action "to recover benefits due … under the terms of [the] plan, to enforce … rights under the terms of the plan, or to clarify … rights under the terms of the plan."   29 U.S.C. §1132(a)(1)(B).   Section 502(a)(2), meanwhile, permits any "participant, beneficiary, or fiduciary" to bring a civil action for appropriate relief under Section 1109 of ERISA.   Section 1109 creates liability for "any person who is a fiduciary"

of a plan for breaching any of the "responsibilities, obligations, or duties imposed upon fiduciaries," and requires the culpable party to "restore to such plan any profits" obtained through the use of plan assets. 29 U.S.C. §1109. The definition of "participant" includes "any employee or former employee … who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. §1002(7). The definition of "fiduciary" reaches any person who "exercises any authority or control respecting management or disposition" of the assets of an employee benefit plan. 29 U.S.C. §1002(21)(A).

Sections 502(a)(1)(B) and 502(a)(2) provide the exclusive remedies for employees seeking to enforce or clarify benefits under an ERISA plan, or to recover plan assets lost due to a breach of fiduciary duty. *E.I. DuPoint Nemours & Co. v. Ampthill Rayon Workers, Inc.*, 290 Fed. Appx. 607, 611 (4th Cir. 2008). Thus, "[t]o the extent that ERISA redresses the mishandling of benefits claims or other maladministration of employee benefit plans, it preempts analogous causes of action, whatever their form or label under state law." *Powell v. Cheseapeake & Potomac Tel. Co. of Va.*, 780 F.2d 419, 422 (4th Cir. 1985). The Fourth Circuit has set forth three factors for determining whether a state law claim is preempted by Section 502. For preemption to apply, (1) a plaintiff must possess standing under Section 502 to bring a claim under the civil enforcement provisions of ERISA; (2) the claim must fall within the scope of an ERISA provision that is enforceable under Section 502(a); and (3) the claim must not be capable of resolution without an interpretation of the contract governed by federal law, i.e., an ERISA-governed employee benefit plan. *Sonoco*, 338 F.3d at 366; *see also Hewett v. Tri-State Radiology, P.C.*, 2009 WL 3048675, at *3 (D.Md. Sept. 17, 2009) (holding, on motion for remand, that action by plaintiff to recover monies owed under employment agreement to fund ERISA pension plan was not preempted by

ERISA.)   Other circuits have created similar tests for conflict preemption under Section 502.   *See Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1487 (7th Cir. 1996); *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1212 (11th Cir. 1999).

*1) The Plaintiff's Breach of Contract Claims*

The Court will first determine whether the breach of contract claims brought by the individual Plaintiffs in this case are preempted by ERISA.[5]   The Plaintiffs allege that the Defendants breached the terms of the NBCWA, by improperly siphoning assets from Mystic, LLC, leaving the company unable to satisfy its obligation to provide retirement healthcare benefits. When viewing the allegations by the individual Plaintiffs in the *Amended Complaint* as true, it is clear that these claims "relate" to an employee benefit plan within the meaning of Section 514. Even if the broad preemptive scope of Section 514 did not reach these claims, the claims nonetheless conflict with the exclusive remedies available under ERISA, as set forth in Section 502(a)(1)(B).

Under the terms of the 2002 NBCWA[6], Mystic, LLC was required to "maintain an employee benefit plan" to provide health benefits to retired miners.   (1993 NBCWA, at 146, att'd as Ex. 1 to Pl. Amended Compl., att'd as Ex. B to Def. Not. of Removal.)   While the Court does not, at this juncture, have the luxury of reviewing the entire NBCWA, including any section that defines terms, the use of the phrase "employee benefit plan" allows only one inference: that Mystic, LLC would provide these benefits through a plan subject to ERISA.[7]   *Shaw* and its

---

[5]  In the *Amended Complaint*, the Plaintiffs merge their claims for breach of contract against Mystic, LLC with their claims for breach of the implied duty of good faith and fair dealing into Count I.   The Plaintiffs then raise identical claims against Defendant Elliott in Count II.   For purposes of ERISA preemption, the Court will construe the claims for breach of contract and breach of the implied duty of good faith and fair dealing against Defendants Elliott and Mystic, LLC as a single claim.

[6]  *See* Note 1, *supra*.

[7]  Section 1002(3) of ERISA defines an "employee benefit plan" as "an employee benefit plan or an employee pension

progeny require the Court, in applying Section 514(a), to determine if a state law claim has a connection to, or references, an ERISA plan.  *California Division of Labor Standards Enforcement v. Dillingham Const.*, 519 U.S. 316, 325-26 (1997), citing *Shaw*, 463 U.S. at 96-97. Because the benefits at issue were to be provided through an ERISA plan, any claim that the Defendants breached the obligation to provide those benefits is inextricably connected to, and references, an ERISA plan, within the meaning of Section 514(a).[8]

In reaching this conclusion, the Court carefully considered whether the Plaintiffs' claims fall within the narrow exception set forth by *Shaw* for claims that have a "tenuous, remote, or peripheral" connection to ERISA.  *Shaw*, 463 U.S. at 100 n.21.  The Court in *Shaw* declined to elaborate on what claims, if any, would fall within this exception.  *See id*.  Much of the subsequent precedent addressing the scope of the *Shaw* exception focused on whether state statutes are subject to ERISA's preemptive effect.  *See, e.g., Retail Industry Leaders Ass'n*, 475 F.3d at 190-193 (Maryland statute preempted by ERISA).  Far fewer cases address whether the *Shaw* exception extends to state common law claims, such as the Defendant's claims for breach of contract. The Fourth Circuit has found that claims for professional negligence and legal malpractice are too remote for Section 514(a) to apply.  *See, e.g., Custer*, 89 F.3d at 1166 ("we do not believe that Congress intended ERISA to preempt state law malpractice claims involving professional services … ERISA does not evince a clear legislative purpose to preempt such traditional state-based laws of general applicability."); *Coyne & Delaney Co. v. Selman*, 98 F.3d

---

plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."  29 U.S.C. §1002(3).   The phrase therefore has a specific meaning in the context of employee benefits.   Given the expertise of the parties involved in the negotiation of the NBCWA and the significant experience of these parties in negotiating ERISA-related issues, the Court finds it highly unlikely that the term "employee benefit plan" would be incorporated into an NBCWA by accident, or without specific intent to refer to a plan falling under ERISA.

[8]  The Court notes the absence from the Plaintiffs' *Amended Complaint* of any allegations that the Defendants, or any other party, denied a claim for benefits under the Mystic, LLC retirement health care benefit plan.

1457, 1459 (4th Cir. 1996) (ERISA did not preempt state law malpractice claims against insurance professional for failing to properly replace ERISA plan.)   Notably, in *Coyne*, the Fourth Circuit reiterated that ERISA was not intended to preempt "traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities," and found that the existence of an ERISA plan was not critical to the plaintiff's claim.   *Coyne*, 98 F.3d at 1459, quoting *Custer*, 89 F.3d at 1167.

However, the Fourth Circuit has found that claims for fraudulent or negligent misrepresentation are preempted.   *See Griggs*, 237 F.3d at 378; *Muse v. Int'l Bus. Machs. Corp.*, 103 F.3d 490, 493 (6th Cir. 1996); *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st cir. 1994); *see also Connor v. Elkem Metals Co.*, 2008 WL 5122197, at *3 (S.D.W.Va. Dec. 5, 2008) (Johnston, J.) (holding that claim for fraudulent misrepresentation "depend[ed] on existence of" an ERISA plan, and thus was "precisely the type to which preemption was intended to apply.") The same rule has applied to claims of intentional infliction of emotional distress, and tortious interference.   *See, e.g., Stiltner v. Beretta U.S.A.*, 74 F.3d 1473, 1481 (4th Cir. 1996) (ERISA preempted tort claim based on plan's refusal to pay benefits, and subsequent threat to deny benefits in retaliation for filing claim); *Feldman's Medical Center Pharmacy v. CareFirst, Inc.*, 902 F.Supp.2d 771, 780-83 (D. Md. 2012) (claims for tortious interference, absent any cognizable link to an employee benefit plan, were not preempted by ERISA).

Perhaps the most helpful case in addressing the scope of the *Shaw* exception is *Stonewall Jackson Mem. Hosp. v. American United Life Ins. Co.*, 963 F.Supp. 553, 561-62 (N.D.W.Va. 1997).   In that case, the plaintiff adopted a pension plan governed by ERISA.   *Stonewall Jackson,* 953 F.Supp. at 555-56.   The plan's assets were invested exclusively in an annuity contract

between the defendant and a hospital association.   *Id*. at 556.   The terms of the annuity contract, at the time of the plaintiff's investment, set forth two procedures for amendment.   *Id*.   In 1995, the plaintiff sought to change its investment approach, and requested that the defendant transfer the plan assets.   *Id*.   The defendant agreed, but, based on amendments to the annuity contract, required a written release of all potential legal claims, and payment of significant surrender charges.   *Id*.   The plaintiff sued for breach of contract, claiming that the amendments violated the annuity contract.   *Id*.   The defendant removed the case to federal court, citing ERISA preemption. *Id*.   On the question of ERISA preemption, the court determined that the "legal rights and obligations" which the plaintiff sought to vindicate "flow not from [an ERISA plan] but from the terms of the collateral annuity contract," and thus arose strictly under West Virginia law.   *Id*. at 563.

In reaching this conclusion, the court focused on the source of the plaintiff's legal rights. The court noted first that in *Stiltner*, the preempted claims "required the plaintiff to prove the existence of legal obligations arising solely under the terms" of an ERISA plan.   *Id*. ("[t]he plaintiff in *Stiltner* could not have met his burden … without establishing that benefits were wrongfully withheld … under the terms of his plan.   In this way, the existence of these plans was essential to the operation of the preempted cause of action.")   The court contrasted *Stiltner* with *Coyne*, where the plaintiff's rights "exist[ed] irrespective of any rights and duties" under an ERISA plan."   *Id*.   The court also noted that in *Coyne*, the Fourth Circuit reasoned that even if determination of a plaintiff's damages required reference to an ERISA plan, the claim was not preempted.   *Id*., citing *Coyne*, 98 F.3d at 1472.   Pulling these various threads together, the court determined that the plaintiff's claims were not preempted by ERISA, because the plaintiff's rights

22

and duties existed irrespective of an ERISA plan, and could be resolved without reference to the plan.   *Id*.

The claims in this case are closer to *Connor* than to *Stonewall Jackson*.   As in *Stonewall Jackson*, the contract at issue, the 2002 NBCWA, is not an ERISA plan.   But the similarities end there.   In *Stonewall Jackson*, the claim for breach of contract arose from an annuity contract, entered into by a hospital that sponsored an ERISA plan.   The contract itself had no relationship to the ERISA plan.   Thus, any rights which arose from the contract were entirely separate from any rights or duties imposed by the ERISA plan.   The same cannot be said for the Plaintiffs' contractual claims in this case.   The NBCWA required Mystic, LLC and other signatories to provide retirement health care benefits through an "employee benefit plan."   The Court has previously found that the "employee benefit plan" language in the NBCWA must refer to an ERISA plan.   Thus, while the Plaintiffs' right to retirement health care benefits arises under a contract, rather than an ERISA plan, the NBCWA specifically envisions that those rights will be satisfied through an ERISA plan.   The NBCWA does not contemplate any alternative means of providing retirement health care benefits.   Thus, the Plaintiffs' right to retirement health care benefits under the NBCWA is inseparable from any rights which exist under ERISA.   This case is more akin to *Connor*, where the plaintiff's "entire case depend[ed] on the existence of an [ERISA] plan," than to *Stonewall Jackson*.[9]

---

[9]  This result is supported by the underlying policy of ERISA.   ERISA's broad preemptive scope was designed to "eliminat[e] the threat of conflicting or inconsistent State and local regulation of employee benefit plans."   *Shaw*, 463 U.S. at 99 (quoting 120 Cong. Rec. 29933 (1974)).   Permitting the Plaintiffs in this case to bring a cause of action under West Virginia law for breach of contract, where the relevant contract clearly relates to an ERISA plan, presents the risk of conflicting and inconsistent regulation.

The Plaintiffs' contractual claims are also subject to conflict preemption under Section 502(a)(2). The core of the Plaintiffs' allegations, as the Court has previously noted, is that Defendant Elliott improperly and unlawfully stripped Mystic, LLC of assets, leaving the company unable to satisfy its retirement health care obligations under the 2002 NBCWA. Section 502(a)(2) is the exclusive remedy for plan participants bringing claims against a fiduciary for a breach of fiduciary duty, pursuant to Section 1109. A person is a "fiduciary" within the meaning of ERISA to the extent that the person "exercises any discretionary authority or discretionary control respecting management" of an ERISA plan, or over "disposition of [the plan's] assets." *Connors v. Paybra Min. Co.*, 807 F.Supp. 1242, 1245 (S.D.W.Va. 1992) (quoting 29 U.S.C. 1002(21)(A)). Accepting the Plaintiffs' allegations as true, Defendant Elliott clearly "exercise[d] … discretionary control" over an ERISA plan, by improperly depriving Mystic, LLC of the assets needed to fund the plan. This is a prototypical fiduciary claim against Defendant Elliott, and falls squarely within the language of Section 502(a)(2). Further, the claim satisfies the preemption requirements of *Sonoco*. The Plaintiffs would have standing to bring their claim under Section 502(a)(2), the claims are enforceable through Section 1109 of ERISA, and resolution of the claims would require reference to an ERISA plan. *Sonoco*, 338 F.3d at 366. Thus, even if the Plaintiffs' claims were not subject to complete preemption under Section 514, they are nonetheless subject to conflict preemption under Section 502(a)(2).

### 2) *The Plaintiffs' Claim for Unlawful Distribution*

The final preemption issue is related to the Plaintiffs' claims for unlawful distribution, under W.Va. Code §31D-6-640. That statute provides, in pertinent part, that a corporation may not make a distribution that would render the corporation (1) unable "to pay its debts as they

24

become due in the ordinary course of business," or (2) insolvent.[10]   W.Va. Code §31D-6-640.   It is readily apparent to the Court that this statute is not completely preempted by Section 514(a) of ERISA.   The statute does not refer to, or in any way directly impact, an employee benefit plan. Instead, it is the sort of traditional "state law of general applicability" discussed in *Custer*, and regulates corporations, "an area traditionally the subject of state regulation."   *Custer*, 89 F.3d at 1165.   However, this does not end the Court's inquiry.   The core of the Plaintiffs' unlawful distribution claim is the allegation that Defendant Elliott improperly distributed assets from Mystic, LLC in order to avoid funding Mystic, LLC's retiree health care obligations under the 2002 NBCWA.   Like the Plaintiffs' claim for breach of the duty of good faith and fair dealing, this claim is fundamentally a claim for breach of fiduciary duty.   As such, it conflicts with Section 502(a)(2) of ERISA, and is subject to preemption.

Having found that all claims brought by the Plaintiffs in their Amended Complaint are preempted by ERISA, the Court construes those claims as claims for breach of fiduciary duty, pursuant to Section 502(a)(2).

### C.   The ERISA Statute of Limitations

Because the Plaintiffs have brought claims for breach of fiduciary duty under Section 502(a)(2), the Court must evaluate the Defendants' argument that these claims must be dismissed in light of the relevant statute of limitations.   Limitations may be raised as a bar to a plaintiff's cause of action on a motion to dismiss if the time bar is apparent on the face of the complaint. *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).   Claims for breach of fiduciary

---

[10]  The Plaintiff does not address whether a private right of action exists under West Virginia law for violations of Section 31D-6-640.   Because the Court finds that these claims are preempted by ERISA, and therefore arise under Section 502(a)(2) of ERISA, the Court will not address this issue.

duty under ERISA are subject to a six-year statute of limitations, with an exception for actual notice.   29 U.S.C. §1113.   That statute provides that:

> No action may be commenced … *after the earlier* of– (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. §1113 (emphasis added).

In their *Amended Complaint*, the Plaintiffs allege that "from 2005 through 2010, Mystic engaged in a number of questionable transactions that demonstrate that Mystic's principals appropriated certain company assets for their own gain."   (Pl. Amended Compl., at ¶29.) Accepting these allegations as true, the final date on which Defendant Elliott could potentially have breached his fiduciary duty under ERISA, for purposes of this motion, was December 31, 2010.   The Plaintiffs first filed their *Complain*t in the Circuit Court of Wyoming County, West Virginia, on November 20, 2015.   (Pl. Compl., at 17, att'd as Ex. A to Def. Mot. to Dismiss.) Thus, the Plaintiffs' claims fall within the six-year limitations period set forth by 29 U.S.C. §1113(1)(A).   However, the Court must still determine whether the Plaintiffs had actual knowledge of the Defendant's purported wrongful conduct more than three years prior to the filing of their *Complaint*, on or before November 20, 2012.   The Plaintiffs' allegations provide the Court with no grounds to believe that the Plaintiff had actual knowledge of the purported wrongful conduct by Defendant Elliott on or before that date.

The Defendants attempt to fit the Plaintiffs' claims within the three-year actual notice window, by claiming that the Plaintiffs, in their response, "admit they had actual knowledge of

26

Mystic and Elliot's alleged breaches in July 2012."   (Def. Reply, at 6.)   This assertion is not only incorrect, it is irrelevant.   The relevant section of the Plaintiffs' response states that a *state law* cause of action for breach of contract in this case accrued in July of 2012, when Mystic, LLC ceased paying health benefits to retired miners.   (Pl. Opposition, at 5, 7.)   Nothing in the Plaintiffs' response indicates that the Plaintiffs had actual knowledge of the Defendants' alleged wrongful conduct on or before November 20, 2015.   Instead, the response indicates that the Plaintiffs knew that their benefits were terminated on that date.   Knowledge of the termination of benefits, and knowledge of a purportedly unlawful transaction(s) which resulted in the termination of benefits, are clearly distinguishable. Furthermore, the proper source for assessing the applicability of a statute of limitations is the Plaintiffs' *Amended Complaint*, as opposed to the party's arguments on a motion to dismiss. *Dean*, 395 F.3d at 474.

## CONCLUSION

Wherefore, after careful consideration, the Court **ORDERS** that the *Defendants' Motion to Dismiss* (Document 5) be **DENIED.**   The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:   September 2, 2016

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

27